### IN THE

# HIGH COURT OF ERRORS AND APPEALS

### FOR THE

# STATE OF MISSISSIPPI.

---

## APRIL TERM, 1853.

### A. & J. DENNISTOUN & Co. *v.* GEORGE POTTS.

The statute of the 21st of December, 1833, (Hutch. Code, 617,) conferred upon notaries-public the power to take the acknowledgment or proof of deeds, whether the lands conveyed were situate in the county of the notary acting, or not. The act of the 26th of February, 1836, transferred to the justices of the peace of the several counties of the State, all the powers theretofore belonging to notaries. *Held,* that in virtue of these statutes, a justice of the peace in Adams county could take the acknowledgment of a mortgage conveying lands and slaves in Washington county; and that his certificate of the acknowledgment could be made in his official character as a justice of the peace, under his common seal.

The act of 1822, creating the office of notary-public, is not repugnant to the constitution of 1832, and was not, therefore, abrogated by the constitution.

Persons holding the office of notary-public at the adoption of the new constitution, could remain in office until otherwise provided by the legislature.

The object of the convention in framing the new constitution, was to remodel the government as established by the old constitution, and not to interfere with offices created by the legislature.

A successor in office is one who performs duties of the same nature as were performed by his predecessor.

The statute passed 26th of February, 1836, (Hutch. Code, 704,) provides that

all the powers theretofore belonging to notaries-public shall, *ex officio*, be vested in the justices of the peace of the respective counties; and that every such justice of the peace may authenticate all his acts, instruments, and attestations by his common seal of office. Hutch. Code, 704.

The officers under the old constitution, at the adoption of the new constitution, were to continue in office until their successors should be duly qualified; and if no organization of the new government had ever taken place under the constitution, the government then in existence would have continued until the present time.

The act of 1836, in relation to justices of the peace, says, that a justice of the peace may certify all his acts under his common seal of office, which is a " scroll." He is not required to keep or use any other seal.

*Held*, that the mortgage was legally admitted to record, and its registration gave constructive notice, such as the law requires, to the parties claiming under the deed of trust; and the mortgage deed is, therefore, entitled to prior satisfaction out of the property.

It is legitimate for A. to substitute himself as a debtor to D., in lieu of B., the original debtor to D.

The mortgage was executed on the 25th of May, 1838, and conveyed the legal title of F. in the property, and he had, at the time the deed of trust was executed, only an equitable estate, or at most a defeasible legal estate in the property. which he parted with to G. and M.; and he (F.) having afterwards become a bankrupt, his interest in the estate to the extent of the surplus, after satisfying the debts secured by the mortgage and the deed in trust, vested in H., the assignee in bankruptcy. This being sold subject to all liens, and the purchaser not having been made a party to the decree, nor his name given, it cannot be regarded as a sale.

In error from the southern district chancery court, at Natchez; Hon. James M. Smiley, vice-chancellor.

This was a suit commenced by George *Potts* in the southern district chancery court, at Natchez, to foreclose a mortgage executed to him by William Ferriday and wife, on the 25th May, 1838, on a plantation of land and negro slaves in Washington county, to secure the debt and interest specified in the mortgage. The mortgage was acknowledged before James K. Cook, a justice of the peace for Adams county, on the same day, as certified by the clerk of the probate court of that county, and was received for record and recorded in the probate clerk's office of Washington county, on the 31st of May, 1838.

When the bill was filed, only a part of the notes secured by the mortgage was due and unpaid, but the principal debt of

$18,892 matured before the hearing of the cause. The bill was amended by agreement of counsel, so as to embrace the entire debt and interest in the suit; and the decree is in the usual form and for the amount claimed. Messrs. Dennistoun & Co., who are the substantial defendants to the bill, as subsequent incumbrancers under a deed of trust made by Ferriday and wife, on the same and other property, dated in March, and recorded in the same office in May, 1839, to John F. Gillespie and others, as trustees, to secure them in a debt, prosecute their appeal to this court from the decision of the vice-chancellor.

Three grounds of error are assigned by the appellants.

First. — That there was no legal notice to the appellants of the existence of the appellee's mortgage, at the date of the deed of trust made to secure Dennistoun & Co.; or, in other words, that the acknowledgment of the mortgage for lands and negroes in Washington county, in this State, before a justice of the peace in Adams county, in the same State, is a nullity, and the record of it was unauthorized, and can have no effect on the subsequently acquired interests of Dennistoun & Co. on the same property.

Second. — That the appellants had no actual or express notice of the existence of this mortgage debt, either before or at the time of Ferriday's deed of trust for their benefit, sufficient to constitute it a prior lien on the property, to the postponement of their subsequent deed of trust.

Third. — That if either the legal or actual notice to the defendants, (as stated in the bill under the allegation of notice generally to the appellants,) be sufficiently made out, then there is usury in the debt due on the mortgage, which the appellants can avail themselves of, and thereby reduce the debt to a very small sum.

*Eustis*, for appellants.

The bill in this case is filed to foreclose a mortgage. The assignee in bankruptcy answers and shows that he has sold the equity of redemption, but does not state in his answer to whom he has sold. The answer of Dennistoun & Co. was already filed, when the fact of this sale was disclosed on the record.

There are three classes of parties — proper, necessary, and indispensable parties. The holder of the equity of redemption belongs to the latter class. No decree can be made without him against intermediate incumbrancers, unless they have distinctly waived the objection in the record. 4 Rand. 451; *Clarke* v. *Long*, 1 Verm. 350. Under the English rule, if the mortgagor is dead, his heir must be before the court; and if abroad, the court cannot proceed. *Scott* v. *Nicol*, 2 Eng. Ch. R. 501· Indispensable party. 2 Robinson's Prac. 57.

The deed of trust expressly reserves the surplus to the grantor and his assigns. If the assignee had answered claiming no interest in the premises, there would be no necessity of looking farther for parties; but he had already sold, and would doubtless have disclosed to whom. No name of solicitor is annexed to the answer, but the answer is so full in statement that the sale was subject to Potts's mortgage, that it looks as if some party aware of complainant's claim drew it up.

The decree in a court of equity is based upon the pleadings and proofs. There must, therefore, be either all the necessary parties, or a waiver in the record.

The objection, for want of necessary parties, is never too late. The appellate court will give leave to amend by adding parties. 1 Barbour, Ch. Prac. 398.

The bill must embrace the whole subject. Ib. 40.

Where the owner of the equity of redemption is not a party to the suit, the master's deed will give no title as against him. *Reed* v. *Marble*, 10 Paige, 413.

The bill being only to foreclose an equity, the plaintiff need only make him who has the equity a party. 3 Ala. R. 335.

In *Bryant* v. *The State*, 1 How. 356, speaking of the board of medical censors, "the provisions of this law (as to mode of appointment, tenure during good behavior, &c.) are manifestly in opposition to the spirit, as well as the declared provisions in the constitution, and must be considered void. For the provisions of the law are nugatory, without the essential officers who alone are authorized to perform the duties required." According to the opinion of Judge Sharkey, there were, therefore, no notaries in this State in 1833, in whom the power to

take acknowledgment of deeds for land out of the county could vest; and without that act, there is no power now in a justice of the peace.

The essential powers of a notary can be vested in a justice by going back to the act of 1822, and seeing what powers were "heretofore belonging to notaries-public," viz., when they had a legal existence in this State.

But if the court adhere to the opinion that justices have the power, by virtue of the act of 1836, embracing what was intended to pass to notaries, had there been such officers by virtue of the act of 1833, then the certificate must show their jurisdiction over the subject of acknowledgment. For they have two separate and distinct jurisdictions; as justices, as to what is in their county; as notaries, as to what is without. The one is limited, the other enlarged.

The record or the certificate must show his jurisdiction in the particular case. *Ross* v. *McLung*, 6 Pet. 283.

The certificate must show in what capacity the judge acts in taking the acknowledgment. *Brown* v. *Patton*, Cooke, 126.

A certificate in relation to a justice of the peace of New York, must certify also that he is chief officer. *Lessee of Rhoades* v. *Selin*, 4 Wash. C. C. R. 714.

The certificate should purport, on its face, that the probate was made by an authorized officer. *Downing* v. *Gallagher*, 2 Serg. & Rawle, 457.

Our statute says that the justice may authenticate, &c., by his common seal of office. He is not compelled to act as notary, and there can be no other evidence that he has so acted than his certifying to the capacity in which he acts. The following authority is in point: "If by virtue of Judge Archer being presiding judge of the district, he is presiding judge, or rather justice of the county court of Hartford, the style of his certificate should have so declared." *Paca* v. *Dutton*, 4 Mo. R. 373.

Form of acknowledgment. Hutch. Code, 607; H. & H. 345, showing opinion of the legislature who adopted the form in 1840. *Elliot* v. *Pearsol*, 1 Pet. 339.

Hutch. Code, 714, gives to members of boards of police in their counties power to take and certify, and also do any other act in relation thereto that a justice of the peace may do.

Private acts incorporating towns make the mayor a justice of the peace. When he acts as justice of the peace, should he not so certify?

In the case at bar, there is nothing in the certificate to indicate that he took the acknowledgment in his character of notary-public. As he is not notary *ex vi termini*, but only has the power if he elects to take it, his certificate alone can show such election. He has as much two distinct powers in two distinct characters, as the probate clerk has.

On the subject of interest on interest. *Childress* v. *Dean*, 4 Rand. 408; Serg. on Sales, 79.

If A. be indebted to B. and B. to C., and C. agrees for an usurious consideration to accept A. for his debtor instead of B., this may be said to be an usurious loan of so much from C. to A. *Wade* v. *Wilson*, 1 East, 197.

By the change of debtors, the plaintiff in this case gains some $1,500 more than he would have received on the original loan, in the same period of time.

*A. Burwell*, on the same side.

*McMurran*, for appellee.

The acknowledgment of the mortgage by the mortgagors, was made in due form by a justice of the peace of Adams county. His official character was certified under the seal of the probate court of that county, and the mortgage was recorded in the proper office, by the proper officer, and in the proper county, Washington county, in May, 1839. Now, we contend that the acknowledgment was taken by a competent officer, and the instrument properly admitted to record. A brief examination of our statutes on this subject will be necessary.

By the act of 1822, (Hutch. Code, 605, sec. 1,) a conveyance of an estate in lands was required to be acknowledged by the parties before a judge of the supreme court of this State, justices of the peace and notaries-public of that county in which

the lands lie, in order to be binding on a purchaser or creditor without notice. The third section provides that marriage settlements, as well as all deeds and mortgages, shall be acknowledged or proved, and lodged for record according to the directions of this act. The fourth section of this act provides that the deeds for personal property, necessary to be recorded, shall be recorded in the county in which such property shall remain ; and if any of the personal property be removed to another county, with the consent of the party interested, and he does not have the deed recorded within twelve months, in the county to which the property has been removed, it shall be void as to purchasers and creditors. Hutch. Code, 605, 606, c. 42, art. 1.

A fair construction of these provisions does not, in my opinion, require the justice or notary taking the acknowledgment to reside in the county, as to personal property, but only as to real estate. The provision of the law for the deed following the property from county to county, whenever removed from one county to another for record, no matter whether acknowledged before a justice of the peace or judge, supports this construction, independently of the phraseology of the statute in regard to the two different kinds of property, real and personal. If we are right in this position, the mortgage would be binding as to the negro slaves, if there had been no further legislation in this respect.

But in December, 1833, the legislature enacted that the acknowledgment or proof of deeds of conveyance, might be made before any judge of the high court of errors and appeals, or of the circuit court, judge of probate, notary-public, or clerk of any court of record in this State, whether the lands be situated in the same county or not. Hutch. Code, 617, art. 5.

Any of these officers were empowered to take acknowledgments of deeds, even for lands, situate in any county in the State. And on the 26th of February, 1836, the legislature passed an act, the two first sections of which are as follows:

" Section 1. Be it enacted by the legislature of the State of Mississippi, That from and after the passage of this act, all the powers heretofore belonging to notaries-public, shall, *ex officio*,

be and vest in justices of the peace of the respective counties of this State.

"Sec. 2. That all acts which may hereafter be done by justices of the peace of this State, of a notarial character, shall receive the same credit and legal import as are attached to the acts of notaries-public within the United States." P. 99.

Notaries, then, by the act of 1833, were authorized to take acknowledgments of deeds of property wherever situate, and in 1836, all the powers theretofore belonging to notaries are vested in the justices of the peace. Take this last act either in its letter or spirit, and it authorizes justices of the peace to take acknowledgments, no matter in what county the property may be at the time. The first section would seem to provide expressly for such a power as that of taking the acknowledgment and proof of deeds, as the second section refers to the usual acts of notaries-public. Unless the first section would embrace the power to take acknowledgments and proofs of deeds, I cannot conceive to what it can apply.

It is said in answer, that there was no such office as that of notary in this State in 1833, and that, therefore, the act of 1833 was a nullity, and consequently the act of 1836 could not confer the power on the justices. But our State constitution of 1832 did not touch the office of notary. It existed in fact and in law, though the office may have been vacant until the powers of the notary were vested in justices of the peace by the act of 1836, cited.

The schedule to the constitution provides for all civil as well as military officers, holding and exercising their offices until superseded pursuant to the provisions of the constitution, and until their successors be qualified; and all laws not repugnant to the constitution, were expressly continued in force. And the act of 1836 recognizes the office of notary, and vesting the powers and duties in justices, shows the understanding and views of the legislature regarding the provision of the constitution just referred to.

The legislature had full power under the constitution to continue the office of notary *eo nomine*, by the election of notaries

for a limited period; but instead of doing so, that body vest the power in justices of the peace. Now, suppose the act of 1836 had provided for the election of one or more notaries in each county, to serve for a couple of years, with all the powers belonging before that time to' notaries, can any one doubt that under the act of 1833, they would have had power to take an acknowledgment of a deed, just as they would have had power to protest a foreign bill of exchange under previous legislation? If the construction contended for by the opposite counsel were to prevail, then I conceive that justices at this day cannot exercise any of the functions for the same reasons. The act of 1836 either confers on justices all the powers we contend for, or it confers none regarding notarial acts, and this act is a dead letter.

Even if no notary-public existed under the present constitution, not even one for the Planters' Bank, as provided in her charter, so that no foreign bill of exchange could be legally protested between the period of the adoption of the constitution and 1836, I contend that this act did, by its express language, by its own vigor and spirit, by its positive enactment in the first section, give to justices all the power which notaries could have exercised, had they been in existence when the acts of 1833 and 1836 were passed. The act of 1833 may have remained a dead letter on the statute-book, but it was no more dead than the act of 1822 and other acts touching notaries, and the act of 1836 revived the law of 1833, and clothed justices of the peace with the powers therein conferred on notaries, as effectually as it revived and clothed justices with the powers granted to notaries by the law of 1822, and the other laws on the subject of notaries.

The rules on this subject are familiar to all of us, and are to be found in every law-book treating of statutes and their construction. Now, what was the intention of the legislature in enacting the law of 1836? What the reason and spirit of it? What the defect or mischief intended to be remedied? To substitute justices of the peace for notaries, vesting in them all the powers previously given by any legislature to notaries. Language could not be more comprehensive to accomplish the

object of the legislature. And yet such a construction is contended for,-that instead of giving effect to the whole of the provisions of the act, effect shall only be given to a part of them. For it cannot be shown, in my opinion, how or in what cases the substantive provisions of the first section can have any operation, unless such construction as we contend for be sustained by this court.

Suppose the law of 1836 had gone more into detail in its language, and had specified that all the powers belonging to notaries-public, by virtue of any laws heretofore passed, or (to be still more literal) had expressly provided that all the powers heretofore conferred on notaries, by the act of the 23d of June, 1822, and by the act of the 25th of December, 1833, and also by any other laws of this State, vest *ex officio* in the justices of the peace of this State; no one could doubt that the magistrate would have the power exercised by him in taking the acknowledgment of the mortgage, in the record. And I defy ingenuity to satisfy the impartial mind, seeking the intention of the legislature, and to carry out such intention, with both reason and policy in its favor, that the language used in the law does not comprehend as clearly the power I contend for, as the additional language (which I have supposed to be inserted in the act) would do.

The court, to effectuate the intention of the legislature in reference to the acknowledgment of deeds, has decided that the acts which we have cited, which authorize clerks of courts of record to take acknowledgments, empower the deputy clerks to do so also. 9 Sm. & Mar. 34.

Suppose deputy clerks had been unknown in practice or to our law, when the power was given to the clerks, and as a class of officers arose subsequently, could it have had any effect on the decision? Surely not.

Usage, too, practice on this subject, would have its weight in favor of the acknowledgment of the Potts mortgage, if the court entertained a doubt.

The testimony of Mr. North and Mr. Mellen bear on this point. And from the inquiries I have made, I have no doubt that half the deeds recorded in this State, subsequent to the

passage of the law of 1836, where the grantors resided out of the county where the property was located, have been and con-tinue to be acknowledged before justices of the peace.

"It is a well settled principle of construction, that convey-ances are, if practicable at any reasonable view of the subject, to be sustained rather than pronounced void, and also that statutes which apparently conflict with each other are to be reconciled, as far as may be on any fair hypothesis, and validity be given to each, if it can be, and is necessary to conform to usages under them, or to preserve titles to property undis-turbed." *Beals* v. *Hall*, 5 How. S. C. R. 51; 3 Ohio, 142; 16 Ib. 651.

*McKeen* v. *Delancey's Lessee*, 5 Cranch, R. 22. A strong case to show usage to prevail; when a "justice of the peace" was authorized to take acknowledgments, it was construed to include justices of the supreme court.

We maintain that Dennistoun & Co. had actual notice of the existence of this mortgage debt, at the time the deed of trust was made to them. We fix upon W. C. Mylne, the active and acting partner in this country, and in the business with Mr. Ferriday, positively and beyond doubt, the knowledge not only of the existence of the mortgage, but the recognition of it as a subsisting lien on the property at the time, which neither the answer of Mr. Mylne, nor the attack on Mr. Ferri-day's character and testimony, can disprove.

The rule of law on this subject of notice is too well known to require much discussion by me, especially as the question has been presented to this court in every phase, in the argu-ment of the case of *Wailes, Administrator*, v. *Cooper and John-son*, 2 Cushman, 208. Courts look most favorably to the upholding of the prior mortgage, especially in a case like the present, where the mortgagee had his mortgage spread upon the records of the proper county a few days after it was made, the year before the Dennistouns obtained their deed of trust from Mr. Ferriday, or had their pecuniary transaction with him.

Upon principle, and a consistent and just view of the decis-ions, the record of this mortgage ought to be deemed sufficient, even if the registry acts had not been strictly complied with as

to the mode of acknowledgment. *Walker* v. *Gilbert*, 1 Freem. Ch. R. 85.

In order to preserve the prior lien, the court will seize upon every circumstance tending to fix notice on the subsequent incumbrancer or purchaser. Any thing that will put him on inquiry is sufficient. *Farmers Bank et al.* v. *Douglass et al.* 11 Sm. & Mar. 471–553; 4 Kent's Com. 179.

The following authorities are fully in point: *Crenshaw's Administrator* v. *Clark and others*, 5 Leigh's Rep. 65; *Green* v. *Kemp*, 13 Mass. Rep. 515; *Moffatt et al.* v. *McDowell et al.* 1 McCord's Ch. R. 434–441; *French et al.* v. *Shotwell*, 5 Johns. Ch. R. 555; 3 Ala. R. 643; 1 Barb. R. 271. See also on the subject generally, and that money paid on an usurious consideration cannot be recovered back, the case of *Bearee* v. *Barstow*, 9 Mass. R. 45–48.

And if the court should consider the question of usury one of moment in this case, then we ask that the court investigate the transaction between Dennistoun & Co. and Mr. Ferriday, and apply the law of usury to it, — a loan in England, where the legal rate of interest is five per cent.; whereas the parties in this instance contracted for seven per cent. They not only forfeit all interest, (and they have realized what would pay the principal debt,) but the whole debt is forfeited, and the contract void, according to those laws.

As to interest upon the interest, as computed by the commissioner, see 3 McLean, 472; 1 Strobh. 115; 2 Mass. R. 568; 3 Richard. 125.

The decree can only bind the parties to it, and a party omitted cannot be affected by it. 3 Johns. Ch. R. 459.

*George S. Yerger*, on the same side.

Mr. Justice FISHER delivered the opinion of the court.

This was a contest in the vice-chancery court at Natchez, between the appellee, George Potts, and the appellants, A. & J. Dennistoun & Co., as creditors of William Ferriday, seeking payment of their respective debts out of the same property, which, it is admitted, is insufficient to satisfy the claims of both creditors.

Dennistoun & Co. *v.* Potts.

The contest arose upon a bill filed by the appellee, to foreclose a mortgage executed by Ferriday and wife to secure the appellee in the payment of eleven promissory notes, specified in the mortgage. The property conveyed, consisting of a plantation, slaves, stock, and planting implements, is situate in Washington county. The mortgage was acknowledged before Henry Cook, a justice of the peace of Adams county; and the acknowledgment was by him certified in the usual form, as a justice of the peace, under his common seal. In addition to which, the clerk of the probate court of said county certified under his proper seal of office, that the said Cook was a justice of the peace of said county, duly commissioned, and that full faith and credit were due to his official acts. Upon this acknowledgment, thus certified, the mortgage was, on the 31st of May, 1838, registered in the office of the clerk of the probate court of Washington county.

The appellants interpose as a defence to the bill, a deed of trust executed by Ferriday and wife on the 7th of March, 1839, to Gillespie and Milligan, as trustees, for the purpose of securing the Messrs. Dennistoun & Co. in the payment of the sum of $178,000 and accruing interest thereon. This deed covers the same property embraced in the mortgage, and was acknowledged before the clerk of the probate court of Adams county, the acknowledgment by him duly certified, and the deed duly registered a few days after its execution in the proper office of Washington county.

The point arising for adjudication upon this state of facts is, whether the registration of the mortgage is void on account of its having been acknowledged only before a justice of the peace of Adams county, whose power to take acknowledgments of deeds, it is insisted, is confined to conveyances of property situate in his own county. His power in this respect, prior to 1836, was certainly circumscribed, as contended by the appellants' counsel; and the question, therefore, presents itself, whether by the legislation of that year, the power was so far extended as to give the justice of the peace of Adams county authority to take and certify the acknowledgment of the mortgage conveying property situate in the county of Washington.

By the statute passed the 21st of December, 1833, it is provided, amongst other things, that proof or acknowledgment of deeds of conveyance might be made before a notary-public, "whether the lands conveyed be situated in the same county or not." It is also provided, that the notary should certify the acknowledgment under his seal of office. Hutch. Code, 617.

By the statute approved the 26th of February, 1836, it is declared, " that all the powers theretofore belonging to notaries-public should, *ex officio*, be and vest in justices of the peace of the respective counties of this State." It is also declared, that " every justice of the peace may authenticate all his acts, instruments, and attestations, by his common seal of office." Hutch. Code, 704.

The counsel for the appellants, in meeting the argument in favor of the authority of the justice of the peace of Adams county, to take the acknowledgment of the mortgage in virtue of these statutes, have insisted, that the office of notary-public, not having been provided for by the new constitution of 1832, was abolished by its adoption; and there being no such officer in the State on the 25th of December, 1833, to be commanded or empowered by the statute above quoted, it was, as to this officer, wholly inoperative and void. Hence it is said that the act of 1836 transferred to justices of the peace only such powers as belonged to notaries while in office prior to the adoption of the new constitution of 1832.

Other questions of minor importance in this connection have been made, and will be stated and noticed at the proper time. Conceding, for the sake of the argument, the correctness of the reasoning of the appellant's counsel, let us examine the premises which counsel seem to have taken for granted, and ascertain whether it is true that the office of notary-public was abolished by the mere silence of the constitution on the subject, and whether, if not abolished, it was not at least possible for persons to have exercised the functions of the office on the 25th of December, 1833; for if so, it must be admitted that they could become the recipients of the power which the law proposed to vest in them. The argument on this subject is, that the notary held his office during good behavior, and the consti-

tution having made no express provision for a continuance of the office, it was abolished by what counsel say was the evident intention and spirit of the 30th section of the declaration of rights, which is in these words, to wit: "No person shall ever be appointed or elected to any office in this State for life, or during good behavior; but the tenure of all offices shall be for some limited period of time, if the person appointed or elected thereto shall so long behave well." This section, if taken as an isolated provision, will not sustain the position of counsel. It contains no intimation in regard to the discontinuance of any office whatever. No inference can legitimately be drawn from it, that the State intended to dispense with a single office then in existence. It proposes to regulate only the period of time, which officers under the new government shall continue in office. The only change which it proposes to effect in the old government, relates, not to the abolition of its offices, but to the term which offices shall be held under the new government. The constitution itself had fixed the tenure, with perhaps a single exception, of the various offices which it had created. As to all others, the tenure was a question for legislative action, the constitution only prescribing that all offices should be held for some limited period of time. But as this subject can be more appropriately considered in connection with the first, third, and fourth sections of the schedule to the constitution, it is for the present passed over.

The first section declares, "that all rights vested and liabilities incurred, shall remain the same as if this constitution had not been adopted." Rights could only remain the same, by receiving as ample protection from the new, as they had received from the laws and officers of the old government. This section was in the nature of a pledge or guaranty made by the State, to continue in force such laws, and in office such officers, as might be necessary to afford full and ample protection to all rights and interests then recognized by the laws of the State, and a government may be said to recognize all rights which its laws and policy do not prohibit.

The third section declares, "that the governor and all officers, civil and military, now holding commissions under the author-

ity of this State, shall continue to hold and exercise their respective offices until they shall be superseded, pursuant to the provisions of this constitution, and until their successors be duly qualified." This section establishes, in the very clearest manner, the proposition already intimated, that it was the organization of the government which was in future to be effected, and not the constitution, which was to abolish the offices and displace the officers of the old government. It is a mistake to say, or to suppose, that the constitution alone abolished a single office or displaced a single officer. It only prescribed the mode in which this might be done. If no organization of the government had ever taken place under the new constitution, the government then in existence would have continued till the present time.

It is manifest, from the whole instrument, that only such offices as had been established by the old constitution, were to be abolished by the new organization. This is too apparent from the language, that all officers should continue in office until their successors should be duly qualified, to admit of controversy. A successor in office is one who performs duties of the same nature as those which were performed by his predecessor. Officers for whom no successor had been provided, whose offices had not been created by the old constitution, but by subsequent legislation, and not abolished by the new constitution, would of course continue to hold their offices, unless the law creating them and prescribing their duties was in conflict with the provisions of the new constitution; for the fourth section of the schedule, already noticed, declares in the most emphatic manner, " that all laws now in force in this State, not repugnant to this constitution, shall continue to operate until they shall expire by their own limitation, or be altered or repealed by the legislature." The office of notary-public was created by a statute passed the 10th of June, 1822. Revised Code, 263. The question here to be considered is, whether this law is repugnant to the provisions of the constitution; for if not, it is, by the express language of that instrument, continued in full force. Experience had demonstrated, that for the convenience of trade and commerce, other officers than

those provided for in the old constitution were necessary. When the first section of the schedule declared that rights should remain the same, it meant all rights and interests which had grown up under the system of laws then in force. If among these there were any, the preservation and protection of which required the action of a notary-public, it was clearly the intention of the convention framing the constitution, from the language employed in the third and fourth sections, that this officer should continue in office.

We have clearly shown that the constitution alone did not abolish a single office of the old government. There is, then, up to this point, no conflict between the law creating the office of notary-public and the new constitution. Did the government which was organized under the constitution affect this officer? This question is easily answered. Has the constitution conferred upon any other officer notarial powers, or so organized the new government as to render the performance of notarial services unnecessary, and at the same time to carry out its obligation to protect and preserve individual rights? If this can be shown, then the conflict between the law and the constitution will be established, and the law, therefore, shown to have been abrogated. What officer under the constitution is invested with the power to protest foreign bills of exchange, or to perform other duties peculiar to a notary-public, under the commercial law? What language has it used by which it can be inferred that these duties have been dispensed with, and persons having important rights in the subjects named fully protected? These questions suggest their own answers. There is no officer named in the constitution clothed with authority to perform these duties, and there is nothing in the constitution dispensing with their performance. They may be performed without entrenching upon the jurisdiction of any officer under the new organization, by a notary, to the same extent that they could under the old organization; and they are no less necessary to the protection of private rights under the one than under the other.

Construing, then, the 30th section in the bill of rights with the three sections in the schedule, what do they all mean?

3 *

What are the prominent objects they seek to accomplish ?   As already remarked in regard to the 30th section, it sought but one object, and that was to reform the old system of government by limiting the tenure of offices.   This was done to stimulate officers to a more faithful discharge of their duties, and to increase their efficiency by increasing their dependence upon the popular will for a continuance of the public confidence.

But is it to be argued, that because this principle was not immediately made operative as to every officer in the State, that the office itself was to be dispensed with, and all the important rights of the citizen falling peculiarly under its jurisdiction left wholly unprotected?   Whether such an argument would or would not be sound, if confined exclusively to this section, it is certain that the constitution has provided against the contingency, and we need not, therefore, trouble ourselves to give any other reason.

The three sections quoted from the schedule, all look to one great object, and that was, to permit not a moment to elapse without a government completely organized, with such laws and officers as were essentially necessary to guard, in the most ample manner, all the great interests of society, whether relating to the persons, property, or vocation of individuals.

These sections, taken either separately or as a whole, contain nothing in conflict with the 30th section of the declaration of rights, which relates, not to the officers, which the State may employ in the administration of the law, but to the tenure of the offices, either created by the constitution, or thereafter by the legislature.   It has reference alone to future appointments, or elections, under the new government.   Indeed, it is not pretended that its language will admit of any other construction ; but that its spirit is different, and must, therefore, control its language.   Now it is not exactly a safe or fair rule of construction to say, that a single section in a constitution has a spirit peculiar to itself, which, if allowed to prevail, must mar other vital parts of the instrument, and render them nugatory. The constitution, as a whole, may be said to have a spirit, which may be appealed to, when necessary, for the purpose of giving harmony and efficacy to the various sections of the

entire instrument; and it is only according to this spirit that it must be interpreted.

But, returning for a moment to the consideration of the third section of the schedule, declaring that all officers holding commissions under the authority of this State, should continue in office until their successors were duly qualified; and leaving out of view every other provision, the mode in which the officers of the old government were to be superseded, will at once suggest itself. We have said, that it was not the design of the convention to leave the State for a moment without a government completely organized. This object could only be attained by continuing in office the officers of the old government, till the new organization should be accomplished; and hence it was the introduction of the successor into office that was to displace the officer of the old government. Where the office was not abolished, its duties not dispensed with, or transferred to some other officer, the office was of necessity to continue, and its incumbents to continue to perform their duties, till otherwise provided by the legislature, or the law creating the office expired by its own limitation. This is not only the fair construction of the language employed in this section, but harmonizes with the first and fourth sections of the schedule, as well as with the primary object of the convention itself, which met to reform the government, and not to leave it in a state of anarchy. A government can only act and make its powers felt through its officers; and these must be sufficiently numerous, and clothed with powers sufficiently varied, to protect all the great interests of the community. Government exists only for the protection of individual rights; and to afford at all times this protection, it must be in a state of complete organization. It is true, that this organization may be complete without providing for the office of notary-public; but it is not true, that in this age of trade and commerce, notarial services can be conveniently dispensed with. Some officer in the State must be clothed with power to perform them; and, repeating what we have already said, the constitution not having abolished the office of notary, dispensed with the performance of notarial services, or transferred the duty to any other officer, we must sup-

pose that the office of notary was left by the convention where it was when the convention met, — under the control of the legislature.

Thus viewing the question, we are of opinion, that the act of the 25th of December, 1833, was, in every respect, operative; that there was then nothing, either in the constitution or laws of the State, to prevent persons from holding the office of notary-public, and performing all the duties incident to the office.

We come now to consider the other question, Whether the power conferred by this act on notaries, was, by the act of 1836, transferred to the several justices of the peace of this State. The language of the act is, that " all the powers heretofore belonging to notaries-public, shall *ex officio* be and vest in justices of the peace of the respective counties of this State." This language does not admit of construction. Had notaries, prior to this act, the power to take the acknowledgment of a deed conveying property, in any county in the State? We have, we think, clearly shown that they had such power. The act of 1836 is not confined merely to duties of strictly a notarial character, but declares expressly, that " the powers belonging to notaries " shall be transferred to justices of the peace. We look always to the law, for the purpose of ascertaining the powers of any officer of the government. We look only to the act of 1833, for the purpose of ascertaining the particular power, about which the present controversy has arisen. We find that a notary could exercise it; and the act of 1836 transfers it to the justices of the peace of the respective counties of the State.

Another objection urged is, that the justice of the peace, in certifying the acknowledgment, appears to have acted as a justice of the peace, and not as a notary-public; and that, therefore, the mortgage was illegally admitted to record. The act of 1836 does not make, as supposed by counsel, the justice of the peace a notary-public. It only invests him with notarial powers. As a justice of the peace, he is required to perform the services which the law required notaries to perform. There is, in this respect, and to this extent, an accession to his powers as a justice of the peace, in which character he must act in performing his duties, and in certifying his official acts; and the

law settles the question, whether the act done was within the scope of his authority. We are, therefore, of opinion, that the certificate was correctly made by the justice of the peace, in his official character as such.

The next and last objection is, that the act of 1833 required the notary to certify the acknowledgment under his seal of office; and that the justice has only certified it under his common seal. The act of 1836 settles this point. It says, that the justice may certify all his acts under his common seal of office. His "common seal" is a "scroll," such as he employs in certifying his warrants, in issuing attachments and other process. He is not required to keep or use any other seal.

We are, therefore, of opinion, that the mortgage was legally admitted to record, and that its registration gave constructive notice, such as the law requires, to the parties claiming under the deed of trust. The mortgage debt is therefore entitled to prior satisfaction out of the property.

The next point is, that the ten promissory notes, for the sum of $1,889.20 each, were given to secure the annual interest on the note for the sum of $18,892, at the rate of ten per cent. per annum; and that they are therefore void, having been given to secure usurious interest. Upon this part of the case, Ferriday was examined as a witness. He says, that "he purchased the Holly Wood" plantation and negroes, from John C. Potts; that the consideration of the purchase was the assumption on his part of all the debts of John C. Potts, upon which he, Ferriday, was security, amounting to about $70,000; and also assumption by him to pay to George Potts, the amount due to him by the said John C. Potts, his brother, of about $18,890, with interest at ten per cent. per annum, being the same rate of interest which the said John C. Potts had been paying to the said George Potts upon the said amount, or debt, previously." The debt due from John C. Potts to " George Potts, was in consideration of a loan of money from latter to former." He shows that the transaction between John C. and George Potts was, by the law then in force, clearly authorized. He only substituted himself as the debtor in lieu of John C. Potts. This he had a right to do, in a legal transaction. The usury, therefore, in our opinion, is not established by the evidence.

The last point made is, that the proper parties were not before the court; and that the decree ought, for this reason, to be reversed.   The mortgage was executed on the 25th of May, 1838.   It conveyed to the complainant, Ferriday's legal title to the property, and he had, at the time the deed of trust was executed, only an equitable estate; or, to say the most, a defeasible legal estate in the property.   This he parted with by the deed of trust to Gillespie and Milligan.   He was afterwards, in 1843, decreed a bankrupt, when his interest in the estate, under the decree, vested in Hunt, the assignee in bankruptcy.   His interest extended only to whatever surplus might remain after satisfying the debts secured by the mortgage, and by the deed of trust.   This interest, Hunt, in his answer to the bill, says he sold; but for what price, or to whom, is not stated.   The purchaser, whoever he may be, was not made a party to the bill, or decree, in the court below; and for this error, it is insisted, the decree ought to be reversed.

Hunt, in his answer, says, that Ferriday's interest in the property was sold, subject to all liens, to blank.   This was no sale at all.   It shows no purchaser; and it was impossible for the complainant, under this showing, to make the supposed purchaser a party to the suit.   The interest must, therefore, be treated as still in the assignee Hunt.

Other reasons, equally satisfactory to us, might be given, why the decree, for this alleged error, should not be reversed; but as we are all agreed upon the above point, it is believed to be unnecessary to state them.

The decree, in all things, affirmed.

NOTE BY REPORTER.—This and the two succeeding cases ought to have appeared in the preceding volume, as the opinions were delivered at the April term, 1853, but they were held up by the court, upon petitions for reargument, until the next term.